1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

MAXINE MARTINEZ,                          Case No.  1:20-cv-00728-CDB (SS)

12            Plaintiff,                  ORDER GRANTING PLAINTIFF'S MOTION
                                          FOR SUMMARY JUDGMENT AND
13      v.                                REMANDING ACTION FOR FURTHER
                                          PROCEEDINGS UNDER SENTENCE FOUR
14  COMMISSIONER OF SOCIAL                OF 42 U.S.C. § 405(g)
    SECURITY,[1]
15                                        (Doc. 18)
            Defendant.
16

17

18          Maxine Martinez ("Plaintiff") seeks judicial review of a final decision of the

19  Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

20  disability insurance and supplemental security income benefits under the Social Security Act.

21  (Doc. 1).  The matter currently is before the Court on the certified administrative record (Doc. 13)

22  and the parties' briefs, which were submitted without oral argument.  (Docs. 18-20).[2]  Plaintiff

23

24          [1] On December 20, 2023, Martin O'Malley was named Commissioner of the Social
    Security Administration.  See https://www.ssa.gov/history/commissioners.html. He therefore is
25  substituted as the defendant in this action. See 42 U.S.C. § 405(g) (referring to the
    "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the
26  Commissioner shall, in [their] official capacity, be the proper defendant.").

27
            [2]  Both parties have consented to the jurisdiction of a magistrate judge for all proceedings
28  in this action, in accordance with 28 U.S.C. § 636(c)(1).  (Doc. 12).

asserts the Administrative Law Judge ("ALJ") erred in his analysis of two issues and requests the decision of the Commissioner be vacated and the case be remanded for the payment of benefits based on the credit-as-true rule.  (Doc. 18 at 19-37).

## I.      BACKGROUND

### A. Administrative Proceedings

On June 2, 2016, Plaintiff filed an application for benefits pursuant to Title II, Part A of Title XVIII, and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*., alleging a period of disability beginning on April 22, 2016.  (Administrative Record ("AR") at 341-53).  Plaintiff was 50 years old on the alleged disability onset date.  *Id*. at 341.  The Commissioner denied Plaintiff's application initially and again on reconsideration.  *Id*. at 116-88.  Plaintiff submitted a written request for a hearing by an ALJ on August 14, 2017.  *Id*. at 213-15.

On March 25, 2019, Plaintiff, represented by counsel, appeared for a hearing before ALJ Gerald Meyer.  *Id*. at 24, 87-115.  Vocational Expert ("VE") Denise Weaver also testified at the hearing.  *Id*. 87, 107-13.

### B. Medical Record

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

### C. Hearing Testimony

Plaintiff testified she lives in Fresno with her son.  *Id*. at 92.  Plaintiff noted her son and daughter drive her because she does not have a car or license.  *Id*. at 93.  Plaintiff stated she completed high school and attended trade school.  *Id*.

Plaintiff testified the last time she had worked was for the Internal Revenue Service ("IRS") from 1991 to 2004.  *Id*. at 93-94.  Plaintiff worked as a clerk, hired and trained new hires, and worked for 11 months of the year.  *Id*.  Plaintiff also took care of her husband until he passed away on February 26, 2005.  *Id*.  Plaintiff returned to work "back [in] 2006, but the union, they just told me I could not concentrate.  I couldn't do it anymore."  *Id*.  The ALJ determined that Plaintiff's past work was too remote in time to be considered.  *Id*.

Plaintiff testified her daughter takes her to appointments and she takes the bus when she

1   can. *Id.* at 95.  Plaintiff stated she takes "like 14 medications" a day and she gets shots every two

2   weeks. *Id.* at 96.  Plaintiff claimed her daughter reminds her to take her medication. *Id.* at 96,

3   104.  Plaintiff testified she has swelling in her feet and has a little problem with her blood sugar.

4   *Id.* at 96-97.

5          Plaintiff also testified she has trouble breathing and has anxiety attacks. *Id.* at 97.

6   Plaintiff testified she takes two asthma pumps a day, but if she has an anxiety attack, then the

7   pumps will not help her, and she ends up going to the hospital. *Id.* at 97, 102.  Plaintiff stated she

8   has an asthma educator to help her with the asthma pumps. *Id.* at 97-98.  Plaintiff also sees a

9   heart doctor because she has an enlarged heart with a hole in it. *Id.* at 98, 101.

10          Plaintiff noted she had gone to the hospital seven or eight times in connection with suicide

11   attempts. *Id.* at 99-100.  Plaintiff stated she has seen a case manager for mental health issues

12   since 2015. *Id.* at 99.  The case manager reminds Plaintiff to take her medications and go to her

13   appointments. *Id.* at 104.  Plaintiff also sees a therapist to address Plaintiff's drug overdoses. *Id.*

14   at 105.  Plaintiff claims her medications help her relax and sleep at night. *Id.* at 106.  Plaintiff

15   stated she takes naps and watches TV during the day. *Id.*  Plaintiff claims she takes medication to

16   take a nap. *Id.*  Plaintiff also asserts she routinely hears voices and noise. *Id.*

17          Plaintiff testified she had trouble breathing even when she did not have a panic attack. *Id.*

18   at 100.  Plaintiff was provided a "gas chamber" by her asthma educator but she sometimes leaves

19   it at home when she is in a hurry. *Id.*  Plaintiff stated she was able to walk to the store where her

20   son works but she has to stop "like three times" because of spinal or breathing issues. *Id.* at 100-

21   01.

22          Plaintiff testified she takes medication for anxiety. *Id.* at 103.  Plaintiff claims she has

23   anxiety attacks if she is late for appointments, and she has difficulty being around a lot of people.

24   *Id.* at 103-04.  Plaintiff noted she tries to go out early in the morning with her daughter to avoid

25   crowds. *Id.* at 104.  Plaintiff testified she walks to the grocery store with her daughter and oldest

26   granddaughter. *Id.*

27          The ALJ proffered a hypothetical to the VE of an individual with the same age, education,

28   and work experience as Plaintiff who is able to perform light work, and not able to climb ladders,

ropes, or scaffolds.  *Id*. at 109.  The individual can occasionally climb ramps and stairs and balance on surfaces.  *Id*.  The individual can frequently, stoop, crouch, kneel, and crawl, can engage in gross and fine manipulation of objects, lift, and feel with the bilateral upper extremities. *Id*.  The individual can have occasional exposure to irritants, such as fumes, odors, dust, and gasses, no use of hazardous machines, and no exposure to unshielded moving mechanical parts and unprotected heights.  *Id*. at 109-10.  The individual would not be able to drive a motor vehicle.  *Id*. at 110.

Further, the individual is able to remember, understand, and carry out only simple and routine instructions and tasks consistent with specific vocational preparation levels 1 and 2 type jobs with only simple work-related decisions with few if any workplace changes.  *Id*.  The individual can have no interaction with the general public and only occasional interaction with coworkers and supervisors, with no tandem tasks with coworkers.  *Id*.  The VE determined that an individual with such limitations could perform work in several fields, including as a folding machine operator (DOT #208.685-014), garment sorter (DOT #222.687-014), and routing clerk (DOT #222.687-022).  *Id*.

The ALJ proffered a second hypothetical of an individual similar to the first but would have to be reminded of tasks frequently during an eight-hour workday by her supervisor and that the individual would require close supervision.  *Id*. at 110-11.  The VE testified that there would be no jobs in the national economy for this individual.  *Id*. at 111.  The ALJ asked the VE if she concurred that an individual from the first hypothetical was restricted to sedentary work "that would place…would grid [Plaintiff[ under the applicable rules."  *Id*.  The VE concurred with the ALJ.  *Id*.

Next, the ALJ asked if due to a combination of medical conditions and mental impairments, a hypothetical individual that would be off task 15 percent or more of the time for an eight-hour day in addition to regularly scheduled breaks could still work.  *Id*. at 111-12.  The VE determined that the individual would be precluded from all work in the national economy.  *Id*. at 112.  The ALJ asked if due to a combination of medical conditions and mental impairments, a hypothetical individual that would have two days of unexcused or unscheduled absences per

1  month could still work. *Id*. at 112-13. The VE held that the individual would be unable to work.
2  *Id*. at 112.

3      Plaintiff's counsel proffered a hypothetical of an individual that would need two
4  unscheduled breaks in addition to normal breaks of at least 15 minutes each in addition to normal
5  breaks. *Id*. at 113. The VE found there would not be work available for that individual. *Id*. The
6  VE noted the breaks would require some type of accommodation from the employer, and if no
7  accommodation was provided there would be no job available. *Id*.

8      **D. The ALJ's Decision**

9      On June 19, 2019, the ALJ issued a decision finding that Plaintiff was not disabled. *Id*. at
10  37-51. The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520(a).
11  *Id*. at 40-51. The ALJ found Plaintiff had not engaged in substantial gainful activity since
12  January 15, 2006, the alleged onset date (step one). *Id*. at 40.[3] The ALJ held Plaintiff possessed
13  the following severe impairment: obesity, disorder of the thoracic and lumbar spine, congestive
14  heart failure, plantar fasciitis, chronic pain, anemia, depressive, bipolar, and related disorders with
15  psychotic features, anxiety, and post-traumatic stress disorder (step two). *Id*.

16      The ALJ determined Plaintiff did not have an impairment or combination of impairments
17  that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,
18  Subpart P, Appendix 1 ("the Listings") (step three). *Id*. at 40-42. The ALJ held Plaintiff had
19  moderate limitations in understanding, remembering, applying information, interacting with
20  others, concentrating, persisting, maintaining pace, and adapting or managing oneself. *Id*. The
21  ALJ noted Plaintiff endorsed auditory hallucinations and had been hospitalized for psychiatric
22  concerns on multiple occasions. *Id*. The ALJ determined Plaintiff's memory was intact, thought
23  process organized, cognition normal, she was cooperative and friendly, with good eye contact,
24  normal insight, and judgment, adequate social judgment, and she was fully oriented. *Id*. The ALJ
25  noted in a function report, that Plaintiff did not allege difficulties, getting along with others,

26

27      [3] The ALJ cited the initially alleged onset date; however, as the ALJ noted earlier in his
opinion, Plaintiff amended the alleged onset date to April 22, 2016, when she moved to dismiss
28  the Title II application. *Id*. 37.

remembering, completing tasks, understanding, following instructions, completing tasks, concentrating, and following instructions. *Id.* at 41.

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"). *Id.* at 42. The ALJ found that Plaintiff retained the RFC:

> "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the individual can never climb ladders, ropes and scaffolds. The individual can occasionally climb ramps and stairs. The individual can occasionally balance on narrow, slippery, or erratically moving surfaces. The individual can frequently, stoop, couch, kneel and crawl. The claimant can handle objects that is gross manipulation, frequently with the bilateral upper extremities. The claimant can finger, that is fine manipulation, of items no smaller than the size of paper clip, frequently with the bilateral upper extremities. The claimant can feel frequently with the bilateral upper extremities. The individual can have occasional exposure to irritants such fumes, odors, dust and gasses. The individual can have no use of hazardous machinery, unshielded moving mechanical parts, and unprotected heights. There should be no driving of motor vehicles as part of the work function. The individual is able to remember, understand, and carry out only simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs with only simple, work-related decisions, with few, if any, work place changes. The individual can have no interaction with the general public. The individual can have only occasional interaction with coworkers and supervisors. However, there should be no tandem tasks with co-workers."

*Id.* The ALJ noted Plaintiff testified:

> "she has swelling in her feet. She can only be on her feet for 10 minutes before needing to sit down. She is on asthma medications. She also has a hard time breathing with anxiety. She has an enlarged heart and a hole in her heart. She has attempted suicide. She has been involuntarily hospitalized for psychiatric concerns. She gets short of breath when walking. She worries a lot and has ruminating thoughts. Going to the store or being around a lot of people causes anxiety attacks. She will go places early in the morning to avoid crowds. Her daughter or case manager reminds her to take medication and about appointments. She has auditory hallucinations. She has to take naps during the day[.]"

*Id.* at 43. The ALJ acknowledged that while Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the ALJ held Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.*

In evaluating Plaintiff's heart condition, the ALJ determined Plaintiff had normal sinus rhythm with normal S1 and S2 without audible click, murmur, thrills, or rubs. *Id.*

1    The ALJ noted Plaintiff's records reflected a 2/6 systolic murmur present at the left lower

2    sternal border and her second heart sound was split, but without gallop.  *Id*.  The ALJ found

3    Plaintiff had "symmetric breath sounds," no wheezes, rhonchi, or rales, and her expiratory

4    phase was within normal limits, and she had no edema or cyanosis.  *Id*.  The ALJ

5    recognized Plaintiff underwent cardiac catheterization on July 25, 2016, which revealed no

6    angiographic evidence of coronary stenosis, her left ventricular end diastolic pressure was

7    elevated but she had normal global left ventricular systolic function.  *Id*.  The ALJ

8    considered "[s]ubsequent records" that reflected an abnormal left ventricular size with

9    abnormal systolic thickening with normal systolic function and that her left ventricular

10   ejection fraction was estimated to be at 30 percent and 41 percent.  *Id*.

11       Next, the ALJ evaluated Plaintiff's back pain, plantar fasciitis, and obesity.  *Id*.  The

12   ALJ noted that Plaintiff's straight leg raising and "Laseque's sign" were negative.  *Id*.  The

13   ALJ found Plaintiff had no muscle spasms, her range of motion was within normal limits in

14   her back, upper extremities, and lower extremities.  *Id*.  The ALJ determined Plaintiff's

15   handgrip was normal, her reflexes were within normal limits and she had good muscle tone

16   with good active motion.  *Id*.  The ALJ noted Plaintiff had 5/5 strength in all extremities,

17   her coordination was intact, gait and balance were normal, she was able to ambulate to the

18   examination room with assistance, and she was able to sit comfortably on the examination

19   table without difficulty or evidence of pain.  *Id*.  The ALJ found imaging revealed

20   degenerative changes to Plaintiff's lumbar and lower thoracic spine, and she had grade 1

21   spondylolisthesis in her L4-L5.  *Id*. at 43-44.  Further, the ALJ considered "SSR 19-2p" in

22   evaluating Plaintiff's obesity.  *Id*. at 44.

23       The ALJ also evaluated Plaintiff's psychological symptoms.  *Id*. at 44-45.  The ALJ

24   noted on August 23, 2016, Plaintiff was found by her children on the ground with spilled

25   medication around her.  *Id*. at 44.  Plaintiff refused to answer questions and was tearful

26   when asked if she was trying to hurt herself.  *Id*.  The ALJ found on examination she was

27   sleepy but easily roused, oriented to self, and was tearful, aggressive, and angry when

28   asked why she took so many pills.  *Id*.  The ALJ recognized subsequent records reflected

1   that she had no thought disturbance, she denied current suicidal or homicidal thoughts, she

2   was alert, oriented, with good memory, concentration, insight, and judgment. *Id*.  The ALJ

3   found at discharge, Plaintiff had no mood disturbance. *Id*.

4        The ALJ noted Plaintiff was involuntarily held for psychiatric concerns on

5   November 19, 2016, after reporting a desire to hurt her children. *Id*.  The ALJ found on

6   examination Plaintiff was slow to respond, was tearful, and exhibited thought blocking. *Id*.

7   Plaintiff's thoughts were disorganized, circumstantial, fragmented, tangential, and she

8   exhibited impaired judgment. *Id*.  The ALJ noted Plaintiff was again hospitalized from

9   May 8, 2018, through May 10, 2018, after an overdose, which she denied was intentional.

10   *Id*.  Plaintiff was again hospitalized for psychiatric concerns from February 23, 2019,

11   through February 24, 2019. *Id*.

12        The ALJ found other records that reflected Plaintiff was cooperative, friendly, fully

13   oriented, had no mood swings or psychotic features, with memory intact, normal cognition,

14   organized thought processes, good insight, normal and intact judgment, and had average

15   intelligence. *Id*.  The ALJ also recognized the records reflected Plaintiff was described as

16   suspicious and disorganized, she had trouble completing thoughts and sentences, and was

17   noted to be non-compliant with her medications. *Id*. at 44-45.

18        The ALJ reviewed Plaintiff's records from a consultative examination performed by

19   Dr. Farshid Yadegar. *Id*. at 45, 609.  The ALJ acknowledged these records described

20   Plaintiff as clean, appropriate, polite, respectful, and cooperative with good hygiene. *Id*. at

21   45.  The ALJ noted Plaintiff was tearful, sad, and her speech was slow and difficult to

22   comprehend with a lot of mumbling. *Id*.  The ALJ noted Plaintiff was "very tangential,"

23   her thinking process was difficult to follow and it impacted her speech. *Id*.  Plaintiff was

24   not persistent, her insight was impaired, her memory was poor, and she was disoriented.

25   *Id*.  Plaintiff did not know what state she was in, who the President was, and the date. *Id*.

26   Plaintiff was able to spell the word "world" after many attempts but could not spell it

27   backwards. *Id*.  Plaintiff was only able to recall 1 of 3 words and she could not focus and

28   answer questions. *Id*.

Further, the ALJ noted Plaintiff endorsed auditory hallucinations and experienced thought blocking and loose association.  *Id*.  Plaintiff was not able to follow a 3-step command or "perform serial 7's."  *Id*.  The ALJ also acknowledged Plaintiff could perform serial 5s and she was able to spell.  *Id*.

Next, the ALJ considered Plaintiff's records from a second consultative examination performed by Dr. Lance Portnoff.  *Id*. at 45, 640.  Plaintiff was adequately groomed, had fair eye contact, and was oriented in time, place, and surroundings.  *Id*. at 45.  Plaintiff's immediate recall was intact, and her thought processes were coherent, but mildly to moderately concrete and preoccupied.  *Id*.  The ALJ noted Plaintiff had mild psychomotor slowing and could only recall 1/3 words after several minutes.  *Id*.  Plaintiff did not know the capital of her state, the president, or the location of the Statue of Liberty.  *Id*.  Plaintiff was unable to perform simple mathematic calculations, could not count backwards from 20, and was unable to interpret common proverbs.  *Id*.  The ALJ found Plaintiff's social judgment was adequate and she had adequate insight.  *Id*.

The ALJ assigned little weight to the opinion of Dr. Yadegar.  *Id*.  The ALJ determined "[w]hile [Plaintiff's] performance on [the] consultative examination supports the examiner's limitations and concerns, the totality of the evidence received at the hearing level is not consistent with these limitations over a longitudinal period."  *Id*.  The ALJ noted Plaintiff was generally described as fully oriented, her thought processes were organized, cognition was normal, and her memory was intact.  *Id*.  The ALJ found that Plaintiff retained the capacity to remember, understand, and carry out only simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs.  *Id*.  Further, the ALJ determined Plaintiff's insight and judgment were normal.  *Id*.  The ALJ stated Plaintiff retained the capacity for only simple, work-related decisions, and jobs with few, if any, workplace changes.  *Id*.  The ALJ noted Plaintiff was cooperative, had good eye contact, and was friendly.  *Id*. at 45-46.  The ALJ held Plaintiff can have only occasional interaction with coworkers and supervisors but with no tandem tasks with coworkers.  *Id*. at 46.

The ALJ assigned partial weight to the opinion of Dr. Portnoff to the extent it was

1    consistent with the totality of the evidence received at the hearing level.  *Id*.  The ALJ then

2    repeated word-for-word the same reasoning and cited the same exhibits he provided in

3    evaluating Dr. Yadegar's opinion.  *Id*. at 45-46.

4          The ALJ assigned little weight to the opinion of a physical medicine consultative

5    examiner, Dr. Mickey Sachdeva.  *Id*. at 46, 597.  The ALJ held "[w]hile [Dr. Sachdeva]

6    supported his opinion with an explanation, the totality of the evidence [was] consistent with

7    further limitations."  *Id*. at 46.  The ALJ noted Plaintiff had good muscle tone with good

8    active motion, she had 5/5 strength in all extremities and her gait and balance were normal.

9    *Id*.  The ALJ found Plaintiff was able to sit comfortably on the examination table without

10   difficulty or evidence of pain.  *Id*.  The ALJ then largely recited his RFC finding.  *See id*.

11         The ALJ assigned little weight to the opinion of Plaintiff's provider, Dr. Mario

12   Ochoa.  *Id*.  The ALJ concluded summarily that Dr. Ochoa's opinions were inconsistent

13   with the totality of the evidence received at the hearing level.  *Id*. at 46-47.  The ALJ then

14   repeated word-for-word the same reasoning and cited the same exhibits he provided in

15   discounting Dr. Sachdeva's opinion.  *Id*. at 47.

16         The ALJ assigned little weight to the opinions of Plaintiff's provider Nurse

17   Practitioner ("NP") Angela Desai.  *Id*.  The ALJ concluded summarily that NP Desai's

18   opinions were inconsistent with the totality of the evidence received at the hearing level.

19   *Id*.  The ALJ then repeated word-for-word the same reasoning and cited the same exhibits

20   he provided in evaluating Drs. Yadegar and Portnoff's opinions.  *Id*.

21         The ALJ assigned partial weight to the opinion of Dr. Jack Lebeau to the extent it

22   was consistent with the totality of the evidence received at the hearing level.  *Id*.  The ALJ

23   then repeated word-for-word the same reasoning and cited the same exhibits he provided in

24   evaluating Drs. Sachdeva and Ochoa's opinions.  *Id*. at 47-48.

25         The ALJ assigned partial weight to the opinion of Dr. Ann Monis to the extent it

26   was consistent with the totality of the evidence received at the hearing level.  *Id*.  at 48.

27   The ALJ then repeated word-for-word the same reasoning and cited the same exhibits he

28   provided in evaluating Drs. Yadegar, Portnoff, and NP Desai's opinions.  *Id*.

The ALJ assigned partial weight to the opinions of the state agency psychological consultants Drs. H. Amadol and Heather M. Abrahimi to the extent consistent with the totality of the evidence received at the hearing level. *Id.* The ALJ then repeated word-for-word the same reasoning and cited the same exhibits he provided in evaluating Drs. Yadegar, Portnoff, Monis, and NP Desai's opinions. *Id.* at 48-49.

The ALJ assigned little weight to the opinions of the state agency medical consultants Drs. R. Betcher and G. Dale. *Id.* at 49. The ALJ found the record was sufficient to establish severe physical impairments. *Id.* The ALJ noted Plaintiff's left ventricular end diastolic pressure was elevated, and she had an abnormal left ventricular size with abnormal systolic thickening. *Id.* The ALJ also noted Plaintiff's left ventricular ejection fraction was estimated to be 30 percent, imaging revealed degenerative changes of the lumbar and lower thoracic spine and there was grade 1 spondylolisthesis at L4-L5. *Id.*

The ALJ assigned little weight to the opinions of Plaintiff's son, Tomas Martinez. *Id.* The ALJ noted Mr. Martinez reported Plaintiff's impairments affected her ability to lift, squat, walk, kneel, and climb stairs. *Id.* The ALJ determined Mr. Martinez's "statement was considered in terms of understanding the severity of Plaintiff's physical and mental impairments, but has been given little weight, as it is a lay opinion based upon casual observation, rather than objective medical examination and testing." *Id.* The ALJ also held Mr. Martinez's opinion did not outweigh the medical evidence regarding the extent to which Plaintiff's impairments limited her functional abilities. *Id.* Specifically, the ALJ found examinations showing 5/5 strength and a normal gait "to be more persuasive in this regard." *Id.*

The ALJ held that the RFC assessment was supported by the record when considered as a whole. *Id.* The ALJ asserted the objective medical and opinion evidence suggested greater sustained capacity than described by Plaintiff. *Id.* The ALJ determined that Plaintiff had no past relevant work (step four) but could perform a significant number of other jobs in the national economy, including folding machine operator, garment sorter, and routing clerk (step five). *Id.* at 49-50. The ALJ concluded Plaintiff has not been under

a disability as defined in the Act.  *Id*. at 50-51.

### E. The Appeals Council's Decision

On March 23, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  *Id*. at 4-10.  Plaintiff filed this action on May 22, 2020, seeking judicial review of the denial of her application for benefits.  (Doc. 1).  The Commissioner lodged the administrative record on April 12, 2021.  (Doc. 13).  Plaintiff filed an opening brief on July 16, 2021.  (Doc. 18).  On August 16, 2021, Defendant filed a responsive brief and Plaintiff filed a reply on August 31, 2021.  (Docs. 19-20).

## II.        LEGAL STANDARD

### A. The Disability Standard

Disability Insurance Benefits and Supplemental Security Income are available for every eligible individual who is "disabled."  42 U.S.C. §§ 402(d)(1)(B)(ii) and 1381(a).  An individual is "disabled" if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment …"[4]  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (quoting identically worded provisions of 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).  To achieve uniformity in the decision-making process, the Social Security regulations set out a five-step sequential evaluation process to be used in determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).  Specifically, the ALJ is required to determine:

> (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe" impairments, (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the RFC to perform past relevant work and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.

*Stout v. Comm'r. Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is

---

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrated by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

1  on a claimant at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citing

2  *Valentine v. Comm'r of Soc. Sec. Admin*, 574 F.3d 685, 689 (9th Cir. 2009)).

3  Before making the step four determinations, the ALJ first must determine the claimant's

4  RFC.  20 C.F.R. § 416.920(e).  The RFC is the most a claimant can still do despite their

5  limitations and represents an assessment based on all relevant evidence.  20 C.F.R. §§

6  404.1545(a)(1); 416.945(a)(1)).  The RFC must consider all of the claimant's impairments,

7  including those that are not severe.  20 C.F.R. § 416.920(e); § 416.945(a)(2).  *E.g.*, *Wells v.*

8  *Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) ("These regulations inform us, first, that in

9  assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's

10  medically determinable impairments, whether severe or not severe.").  The RFC is not a medical

11  opinion.  20 C.F.R. § 404.1527(d)(2).  Rather, it is a legal decision that is expressly reserved to

12  the Commissioner.  20 C.F.R. § 404.1546(c); *see Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th

13  Cir. 2001) ("[I]t is the responsibility of the ALJ, not the claimant's physician, to determine

14  residual functional capacity.").

15  At step five, the burden shifts to the Commissioner to prove that Plaintiff can perform

16  other work in the national economy given the claimant's RFC, age, education, and work

17  experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).  To do this, the ALJ can use

18  either the Medical-Vocational Guidelines or rely upon the testimony of a VE.  *Lounsbury v.*

19  *Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th

20  Cir. 2001).  "Throughout the five-step evaluation, the ALJ 'is responsible for determining

21  credibility, resolving conflicts in medical testimony and for resolving ambiguities.'"  *Ford*, 950

22  F.3d at 1149 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

23  **B. Standard of Review**

24  Congress has provided that an individual may obtain judicial review of any final decision

25  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In

26  determining whether to reverse an ALJ's decision, a court reviews only those issues raised by the

27  party challenging the decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  A

28  court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on

legal error or are not supported by substantial evidence.  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

"Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir, 1995)).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." *Thomas v. CalPortland Co.*, 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal quotations and citations omitted).  "If the evidence 'is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.'" *Ford*, 950 F.3d at 1154 (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  *Stout*, 454 F.3d at 1055-56.  An error is harmless where it is "inconsequential to the [ALJ's] ultimate nondisability determinations." *Tommasetti v. Astrue,* 533 F.3d 1035, 1038 (9th Cir. 2008) (quotation and citation omitted). The burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

### III.   LEGAL ISSUES

Plaintiff asserts the ALJ committed harmful error by failing to defer and afford "greatest weight" to the medical source statements of consultative examiner Dr. Yadegar, treating physician Dr. Ochoa, and treating NP Desai, "absent the requisite 'specific and legitimate' reasons."  (Doc. 18 at 6, 19-33).  Plaintiff also argues the ALJ committed harmful error by failing to provide "clear and convincing" reasons for rejecting Plaintiff's symptomology evidence.  *Id*. at 6, 33-37.

1

## IV.   DISCUSSION

2   **A.      Whether the ALJ committed harmful error by failing to afford "greatest**

3   **weight" to the opinions of Drs. Yadegar, Ochoa, and NP Desai.**

4          For Social Security disability cases filed before March 27, 2017, the weight to be given to

5   medical opinions depends in part on whether the opinions are proffered by treating, examining, or

6   nonexamining health professionals.[5] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Fair v.*

7   *Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  "As a general rule, more weight should be given to

8   the opinion of a treating source than to the opinion of doctors who do not treat the claimant…" as

9   a treating doctor is employed to cure and has a greater opportunity to know and observe the

10  patient as an individual.  *Lester*, 81 F.3d at 830; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.

11  1996); *Bates v. Sullivan*, 894 F.2d 1059, 1063 (9th Cir. 1990); *Cf. Pitzer v. Sullivan*, 908 F.2d

12  502, 506, n.4 (9th Cir. 1990) (the least weight is given to the opinion of a non-examining

13  professional).

14         The uncontradicted opinion of a treating or examining physician may be rejected only for

15  clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at

16  831.  The opinion of a treating or examining physician that is controverted by another doctor may

17  be rejected only for specific and legitimate reasons supported by substantial evidence in the

18  record.  *Id*.  Specific and legitimate reasons require the ALJ to set out a detailed and thorough

19  summary of the facts and conflicting clinical evidence, state his/her interpretation of the evidence,

20  and make a finding.  *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *see Reddick v.*

21  *Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions.

22  He must set forth his interpretations and explain why they, rather than the doctors', are correct.").

23  Absent specific and legitimate reasons, the ALJ must defer to the opinion of a treating or

24

25         [5] Effective March 27, 2017, Revisions to Rules Regarding the Evaluation of Medical
   Evidence removed provisions extending *per se* preferential status to opinions of treating
26  physicians.  Because Plaintiff's application was filed prior to March 27, 2017 (AR at 341-53) and
   not decided until after that date, 20 C.F.R. §§ 404.1527(c) and 416.927(c) apply and required the
27  ALJ to extend preferential status to treating as compared to non-treating medical sources.  *See,*
   *e.g., Chessani v. Saul*, No. 2:20-cv-0082 DB, 2021 WL 916198, at *3 n.3 (E.D. Cal. Mar. 10,
28  2021) (citing *Edinger v. Saul*, 432 F. Supp. 3d 516, 530 & n.16 (E.D. Pa. 2020)).

1   examining physician.  *See Lester*, 81 F.3d at 830-31.

2       1.  Dr. Yadegar

3       Plaintiff was seen by Dr. Yadegar on September 7, 2016.  AR at 605-09.  Dr. Yadegar

4   documented Plaintiff claimed she had difficulty focusing, her neighbors were bothering her, she

5   had anxiety attacks, was taking too many sleeping pills while drinking alcohol, and was taken for

6   psychiatric hospitalizations.  *Id*.  Dr. Yadegar noted Plaintiff mentioned she had been homeless on

7   and off.  *Id*.  Plaintiff "just got a place, but she is behind in rent for two months" and she was still

8   grieving her husband's loss.  *Id*.  Dr. Yadegar identified Plaintiff was taking Remeron and

9   Fluoxetine for a few years, but Plaintiff was unable to provide the exact date she started the

10  medication.  *Id*.

11      Dr. Yadegar noted Plaintiff was hospitalized in 2005, at Community Behavioral Health

12  Center ("Community") for danger to herself around the time when her husband died.  *Id*. at 606.

13  Plaintiff was again hospitalized at Community on August 23, 2016, for danger to herself.  *Id*.  Dr.

14  Yadegar noted "[i]n the report that she brought with her, it said 'I don't want to live anymore'"

15  and "[s]he wanted to hurt herself."  *Id*.

16      Dr. Yadegar reviewed her family, social, and employment history.  *Id*.  Dr. Yadegar noted

17  Plaintiff was using alcohol up until August 25, 2016, but Plaintiff believed she was not addicted.

18  *Id*.  Dr. Yadegar also discussed Plaintiff's activities of daily living.  *Id*.  Dr. Yadegar noted "[s]he

19  can do pretty much [*sic*] around the house" but when her feet hurt, she can't walk very long, gets

20  tired, and starts to have anxiety thinking she won't be able to get to her destination.  *Id*.

21      Dr. Yadegar found Plaintiff was clean, and appropriate with good hygiene.  *Id*.  Dr.

22  Yadegar determined Plaintiff was polite, respectful, cooperative, pleasant, "but very tearful, very

23  sad."  *Id*.  Dr. Yadegar stated her mood and affect was extremely sad and depressed, although she

24  denied feeling suicidal and homicidal at the examination.  *Id*.  Dr. Yadegar noted Plaintiff's

25  speech was slow, mumbled, and difficult to comprehend sometimes.  *Id*. at 607.  Dr. Yadegar

26  determined Plaintiff was "very tangential" and her thinking process was "really difficult to follow

27  her speech and she elaborates that she gets lost in her own thoughts impacting her speech."  *Id*.

28      Next, Dr. Yadegar noted Plaintiff claimed she experienced auditory hallucinations when

she was depressed and when she was around people.  *Id*.  Dr. Yadegar found Plaintiff could not

really tell him clearly what she was hearing and was "very vague."  *Id*.  Dr. Yadegar reported

Plaintiff stated, "the voices tell her sometimes let go of her husband, get over it and she

mentioned that she can't."  *Id*.  Dr. Yadegar found Plaintiff had to rely on a list to remember what

medication to take and not to take.  *Id*.  Plaintiff reported feeling 8/10 in regard to feeling

depressed and anxious.  *See id*. ("Depression being 10, 1 being happy… 10 being the worse

anxiety, 1 being no anxiety at all").

Dr. Yadegar determined Plaintiff was oriented to plate but she did not know what state she

was in, the president, or "today's date."  *See id*. ("I have been sleeping a lot, I cannot remember

today's date.  I think we are in September or August.").  Dr. Yadegar found Plaintiff only knew

her date of birth and the purpose of the visit.  *Id*.  Dr. Yadegar reported Plaintiff was "definitely

disoriented."  *Id*.

Dr. Yadegar noted Plaintiff could spell the word "world" after many attempts but was

unable to spell it backward.  *Id*.  Plaintiff did not have her address or phone number memorized.

*Id*.  Dr. Yadegar found Plaintiff's memory was impaired, that "she is oriented," and that he had

major concerns with her cognition.  *Id*.  Dr. Yadegar determined Plaintiff could not focus and

answer questions, she had thought blocking, loose association, and her mind was defragmented

and confused.  *Id*.  Further, Dr. Yadegar reported Plaintiff could perform calculations but had

difficulties in concentration, abstract thinking, similarities/differences, and with judgment/insight.

*Id*. at 608.

Dr. Yadegar stated Plaintiff's condition "is problematic, so it is very concerning…I am

very concerned and I do like her to see someone for the intellectual abilities, possibly some form

of treatment that she can go to."  *Id*. at 607-08.  Dr. Yadegar held Plaintiff "definitely needs some

form of case management, someone to help her with finances, someone to help her with

managing her daily living situation."  *Id*. at 608.  Dr. Yadegar warned without support Plaintiff

could become homeless again and could end up hurting herself.  *Id*.  Dr. Yadegar noted Plaintiff

has children but did not know how much they could help her.  *Id*.

Dr. Yadegar diagnosed Plaintiff with a not otherwise specified ("NOS") depressive

1   disorder, and a NOS anxiety disorder.  *Id*.  Dr. Yadegar "rule[d] out cognitive, as well as,

2   intellectual disability difficult, challenges" and alcohol dependence.  *Id*.  Dr. Yadegar referred

3   Plaintiff to the "Department of Mental Health just in case she became depressed again and wants

4   to hurt herself and some kind of support system would definitely be good for her."  *Id*.

5       Dr. Yadegar concluded Plaintiff's prognosis was not good as she had a lot of difficulties

6   and various challenges, in her life.  *See id*. at 608-09 ("She is taking her medications really well,

7   but restraining herself and accomplishing tasks is very difficult for her.").  Dr. Yadegar again

8   noted Plaintiff would benefit from some support from a case manager.  *Id*. at 608.

9       Dr. Yadegar noted Plaintiff was not capable of managing her funds and stated Plaintiff

10   was mildly impaired in her ability to perform simple and repetitive tasks.  *Id*. at 609.  Dr. Yadegar

11   found Plaintiff was moderately impaired in her ability to handle instructions from a supervisor.

12   *Id*.  Dr. Yadegar determined Plaintiff was markedly impaired in her ability:

13       "to perform detailed and complex tasks, interact with co-workers and the public, to perform
         work activities on a consistent basis without special or additional instruction, to maintain
14       regular attendance in the workplace, to complete a normal workday/workweek without
15       interruptions from a psychiatric condition, and deal with the usual stress encountered in the
         work place."
16

17   *Id*.  Dr. Yadegar concluded he had "never given this kind of rating, so this is really alarming, it is

18   very concerning to me."  *Id*.

19       As discussed above, the ALJ assigned little weight to the opinion of Dr. Yadegar because

20   "the totality of the evidence received at the hearing level is not consistent with these limitations

21   over a longitudinal period."  *Id*. at 45.

22       Plaintiff argues the ALJ failed to provide specific and legitimate reasons to discount Dr.

23   Yadegar's opinion.  (Doc. 18 at 20).  Plaintiff asserts the ALJ used the "same, cherry-picked

24   language, verbatim" to reject Dr. Yadegar's opinion as he did with five other opinions.  (Docs. 18

25   at 20, 22; 20 at 3-5).  Plaintiff contends the ALJ mischaracterized the record by highlighting

26   negative findings of psychological impairment taken during gynecological examinations and

27   failing to address "extensive" positive findings of psychological impairment, Plaintiff's non-

28

18

conservative treatment, and Plaintiff's hospitalizations.  (Docs. 18 at 22-25, 27; 20 at 7, 9-10).

Additionally, Plaintiff argues the ALJ erred in failing to address "the extensive, specific, and

rather ominous" findings of Dr. Yadegar.  (Docs. 18 at 24; 20 at 7).

In response, Defendant claims the ALJ's findings were based on a reasonable

interpretation of the record and supported by Dr. Monis' opinion.  (Doc. 19 at 8-9).  Defendant

asserts the ALJ considered both the positive and negative mental status findings.  *Id*. at 9.

Defendant contends the longitudinal record cited by the ALJ showed Dr. Yadegar's opinion was

not supported by the generally normal exam findings.  *Id*.  Defendant avers "Plaintiff's contention

that the ALJ could not rely on mental status findings in records where she received treatment for

physical impairments is incorrect." *Id*.

The Court finds the ALJ has failed to provide specific and legitimate reasons to discount

examining physician, Dr. Yadegar's opinion.  As detailed above (*supra* 9-11), the ALJ assigned

little weight to Dr. Yadegar and NP Desai's opinions and partial weight to Drs. Portnoff, Monis,

Amadol, and Abrahimi.  Despite the differences in the assigned weight and the inherent

differences within the opinions, the ALJ provided alternating versions of a "boilerplate"

explanation for all six opinions.  The ALJ's reliance on identical reasoning for addressing all six

opinions "tends to indicate that the ALJ used standard boilerplate language to address [the]

opinions irrespective of their individual content." *Deleon v. Saul*, No. CV 19-1687-GSA, 2021

WL 63336, at *5 (E.D. Cal. Jan. 7, 2021).  Particularly given the ALJ's summary and conclusory

discounting of the physicians' opinions (including those of Dr. Yadegar), the ALJ's recitation of

boilerplate language is not sufficiently specific.  *Id*. (citing *Garrison*, 759 F.3d at 1013) (noting

that the specific and legitimate reasoning standard is not satisfied where the ALJ uses "boilerplate

language that fails to offer a substantive basis for his conclusion.").

To take one example, the ALJ summarily discounted the opinions of Drs. Yadegar and

Portnoff and cited as support the same, verbatim listing of more favorable and generalized

assessments of Plaintiff's medical examinations. AR 45-46.  However, the two opinions offered

unique insights and perspective – including, as to Dr. Yadegar, Plaintiff's endorsement of

auditory hallucinations – yet the ALJ's opinion offers no indication that he gave individualized

1  consideration to the examining doctors' assessments.  Accordingly, the ALJ has failed to provide

2  a specific reason to discount Dr. Yadegar's opinion.

3        Next, the Court holds Plaintiff failed to provide legitimate reasons to discount Dr.

4  Yadegar's opinion.  As Plaintiff acknowledges, an ALJ may properly review and consider mental

5  impairments addressed in medical records documenting a patient's treatment for physical

6  impairments.  *See* (Doc. 20 at 6) ("The Defense mischaracterizes the argument in Pl. Br. by

7  opining, incorrectly, that Ms. Martinez's contention was that 'the ALJ could not rely on mental

8  status findings in records where she was receiving treatment for physical impairments.'").

9  However, it is equally true that an ALJ may not "cherry-pick" negative findings of mental

10  impairment and ignore positive findings of mental impairment.  *See Holohan v. Massanri*, 246

11  F,3d 1195, 1207 (9th Cir. 2001) (reversing where the ALJ "selectively relied on some entries [in

12  the plaintiff's treatment records] and ignored the many others that indicated continued, severe

13  impairment.").

14        As discussed above, the ALJ cited exhibits that showed Plaintiff was oriented (AR at 559,

15  666, 952), she had normal insight and judgment (*id*. at 677, 679, 952, 954, 956), intact memory

16  (*id*. at 560, 666, 986), she was cooperative (*id*. at 559, 666, 677, 679), had good eye contact (*id*. at

17  679, 952, 956), and was friendly (*id*. at 954).  However, those same exhibits also provided

18  positive findings of mental impairment that the ALJ did not address when discounting Dr.

19  Yadegar's opinion.  *See* AR at 677, 679, 952, 954, 956.  Specifically, Plaintiff's thought content

20  was helpless/hopeless, had hallucinations, she was anxious and depressed, and she suffered from

21  liable, blunt, and flat affect.  *Id*.  The ALJ's failure to address these positive findings of mental

22  impairment, while citing negative examples from the same exhibits, demonstrates the ALJ

23  impermissibly relied on evidence from the record selectively.

24        Further, the Court holds the ALJ erred in discounting Dr. Yadegar's opinion without

25  discussing his conclusion relating to severity.  Following his examination, Dr. Yadegar found

26  Plaintiff was markedly impaired in six different categories.  *Supra* 18.  Dr. Yadegar concluded, "I

27  never [have] given this kind of rating, so this is really alarming, it is very concerning to me."  AR

28  at 609.  An ALJ is not required to discuss all evidence that is presented, but unquestionably must

explain why significant probative evidence has been rejected.  *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (citation omitted); *see Matthew A. B. v. Berryhill*, No. 3:18-cv-05531-DWC, 2019 WL 1594363, at *4 (W.D. Wash. Apr. 15, 2019) ("[T]he ALJ's description of Dr. Koch's evaluation overlooks abnormal findings which may support her opined limitations.").  Here, the ALJ's failure to even note Dr. Yadegar's disconcerting conclusion (*see generally id*. at 37-51) constitutes a striking omission from the ALJ's opinion.  Under these circumstances, the Court cannot find that the ALJ provided specific and legitimate reasons supported by substantial evidence to discount Dr. Yadegar's opinion.

   2.   Dr. Ochoa

Plaintiff was seen by Dr. Ochoa between July 8, 2015, and February 16, 2019.  AR at 532-36, 552-53, 959-67).  Dr. Ochoa treated Plaintiff for left foot pain, cough, chest pain, swelling, abnormal uterine bleeding, chronic back pain, shortness of breath, and anxiety.  *Id*.

On September 14, 2017, Dr. Ochoa completed a physical medical source statement for Plaintiff.  *Id*. at 645-48.  Dr. Ochoa diagnosed Plaintiff with foot pain, musculoskeletal pain, asthma, and hypertension.  *Id*. at 645.  Dr. Ochoa noted Plaintiff experienced pain, fatigue, tenderness, stiffness, depression, and anxiety.  *Id*.  Dr. Ochoa found Plaintiff's impairments had not lasted or were not expected to last at least twelve months.  *Id*.

Dr. Ochoa estimated Plaintiff could walk one city block without rest or severe pain.  *Id*.  Dr. Ochoa noted Plaintiff could sit 45 minutes before needing to get up and stand 20 minutes before needing to sit down or walk around.  *Id*.  Dr. Ochoa found Plaintiff could sit for about four hours and stand/walk about two hours total in an eight-hour workday (with normal breaks).  *Id*.  Dr. Ochoa held Plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking.  *Id*.  Dr. Ochoa determined Plaintiff would need to walk around during an eight-hour workday every 30 minutes for 10 minutes each time.  *Id*. at 646.

Dr. Ochoa found Plaintiff would sometimes need to take unscheduled 15-minute breaks during a workday every one to two hours.  *Id*.  Dr. Ochoa stated Plaintiff's chronic fatigue, pain/ paresthesias, and numbness caused a need for these breaks.  *Id*.  Dr. Ochoa determined Plaintiff could lift and carry in a competitive work situation less than 10 pounds occasionally, 10 pounds

occasionally, 20 pounds rarely, and 50 pounds never.  *Id*.  Dr. Ochoa found Plaintiff could rarely twist, and occasionally stoop/bend, crouch/squat, climb stairs, and climb ladders.  *Id*.  Dr. Ochoa noted Plaintiff could use her hands/fingers/arms to grasp, turn, twist objects, engage in fine manipulations, and reach in front of the body and overhead, 80% of an eight-hour workday.  *Id*. at 647.

Dr. Ochoa estimated Plaintiff was likely to be off task 20% of the time during a typical workday.  *Id*.  Dr. Ochoa reported Plaintiff was capable of low-stress work and she was likely to have "good days" and bad days."  *Id*.  Dr. Ochoa determined Plaintiff was likely to be absent from work more than four days per month.  *Id*.  Dr. Ochoa found Plaintiff could walk a block at a reasonable place on rough or uneven surfaces, use standard public transportation, grocery, and clothes shop, go to the bank, and climb stairs at a reasonable pace with use of only a single handrail.  *Id*.  Dr. Ochoa affirmed that Plaintiff's impairments, demonstrated by signs, clinical findings, and laboratory or test results were reasonably consistent with the functional limitations he provided.  *Id*. at 648.  Dr. Ochoa reiterated that Plaintiff could not sit, stand, or walk too long due to pain.  *Id*.

On October 27, 2018, Dr. Ochoa completed a second physical medical source statement for Plaintiff.  *Id*. at 896-99.  Dr. Ochoa diagnosed Plaintiff with chronic renal failure, hypertension, asthma, and chronic pain.  *Id*. at 896.  Dr. Ochoa determined Plaintiff had 9/10 stabbing pain on the back of her legs, stiffness in her hands and fingers, and reduced sensation in her right leg.  *Id*.  Dr. Ochoa concluded Plaintiff's impairments had lasted or were expected to last at least 12 months and that Plaintiff's "bipolar disease" affected her physical condition.  *Id*.

Dr. Ochoa estimated Plaintiff could walk half of a city block without rest or severe pain.  *Id*.  Dr. Ochoa noted Plaintiff could sit 30 minutes before needing to get up and stand 10 minutes before needing to sit down or walk around.  *Id*. at 897.  Dr. Ochoa estimated Plaintiff could sit about four hours and stand/walk less than two hours total in an eight-hour workday (with normal breaks).  *Id*.  Dr. Ochoa determined Plaintiff would need to walk around during an eight-hour workday every 20 minutes for 5 minutes each time.  *Id*.

Dr. Ochoa found Plaintiff would sometimes need to take unscheduled 15-minute breaks

during a workday every 20 to 30 minutes.  *Id.*  Dr. Ochoa stated Plaintiff's chronic fatigue, pain/ paresthesias, numbness, and muscle weakness caused a need for these breaks.  *Id.*  In a marked degradation in his assessment of Plaintiff's weight-bearing capability since his first exam of her one year earlier, Dr. Ochoa determined Plaintiff could lift and carry in a competitive work situation less than 10 pounds rarely, and never anything 10 pounds or over.  *Id.* at 898.  Dr. Ochoa opined Plaintiff could occasionally twist, stoop/bend, crouch/squat, climb stairs, and climb ladders.  *Id.*  Dr. Ochoa noted Plaintiff could use her hands/fingers/arms to grasp, turn, twist objects, engage in fine manipulations, and reach in front of the body and overhead, 10% of an eight-hour workday.  *Id.*

Dr. Ochoa estimated Plaintiff was likely to be off task 25% of the time during a typical workday.  *Id.*  Dr. Ochoa reported Plaintiff was incapable of even "low stress" work due to her "bipolar condition."  *Id.*  Dr. Ochoa found Plaintiff's impairments produced mostly bad days.  *Id.* Dr. Ochoa determined Plaintiff was likely to be absent from work more than four days per month. *Id.* at 898.  Dr. Ochoa estimated the earliest date the functional limitations noted above applied to Plaintiff in 2015.  *Id.*

As discussed above, the ALJ assigned little weight to the opinion of Dr. Ochoa because it was inconsistent with the totality of the evidence received at the hearing level.  *Id.* at 46-47. Plaintiff asserts the ALJ failed to provide specific and legitimate reasons to discount Dr. Ochoa's opinion.  (Doc. 18 at 29-33).  Plaintiff claims the ALJ "harmfully and erroneously cherry-picks citations findings in the one-time physical CE examination" performed by Dr. Sachdeva.  *Id.* at 31.  Plaintiff contends the ALJ mischaracterized "citations to 'Exhibit 4F'" because it is a gynecological examination and not an applicable orthopedic evaluation.  *Id.* at 32. Plaintiff asserts the ALJ's physical RFC is not supported by substantial evidence as it is not based on any treating, examining, or reviewing physician.  *Id.* at 32.  Plaintiff claims the ALJ improperly interpreted medical data to develop the RFC at issue.  *Id.* at 32-33.

In response, Defendant argues the ALJ reasonably gave little weight to Dr. Ochoa's opinion of disabling physical limitations.  (Doc. 19 at 10).  Defendant claims Dr. Ochoa's opinions were inconsistent with the totality of the evidence.  *Id.*  Defendant argues the ALJ

provided objective findings that did not support Dr. Ochoa's restrictive limitations in areas such as lifting, standing, and walking. *Id.* at 10-11. Defendant avers the ALJ is not required to base the RFC finding on a physician's opinion and it was the responsibility of the ALJ to determine the RFC. *Id.*

The Court finds the ALJ has failed to provide specific and legitimate reasons to discount the opinion of examining physician Dr. Ochoa. Like Dr. Yadegar, the ALJ provided a "boilerplate" explanation in assessing the opinions of Drs. Ochoa, Sachdeva, and Lebeau. AR at 46-48. For the same reasons articulated above in connection with finding the ALJ's treatment of Dr. Yadegar's opinion was erroneous, his use of boilerplate language as to Dr. Ochoa is not sufficiently specific. *Supra* 19.

The ALJ assigned Drs. Ochoa and Sachdeva's opinions little weight and, with verbatim supporting language, assigned Dr. Lebeau's opinion partial weight. *Id.* at 46-47. The ALJ's opinion does not indicate why Dr. Ochoa was assigned less weight than Dr Lebeau, beyond the conclusory statements that Dr. Ochoa's "opinions are inconsistent with the totality of the evidence received at the hearing level[,]" and Dr. Lebeau's opinion, "to the extent [] is consistent with the totality of the evidence received at the hearing level. *Id.* It was the ALJ's burden to identify and resolve this discrepancy. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *see Gray v. Comm'r of SSA*, 365 Fed. App'x 60, 62 (9th Cir. 2010) ("When medical records are at odds with each other or in any way conflict, it is the ALJ's role to assess and resolve conflicting medical evidence"). Although the ALJ "summarizes" the physical evidence of record (AR at 43-44), the ALJ fails to identify why these findings do support Dr. Ochoa's opinion. The Court cannot speculate as to what evidence received at the hearing level that the ALJ used to assign Dr. Ochoa's little weight and Dr. Lebeau more. Accordingly, the Court cannot find that the ALJ provided specific and legitimate reasons supported by substantial evidence to discount Dr. Ochoa's opinion.

3. NP Desai

As a threshold matter, the Court must determine whether NP Desai qualifies as an accepted medical source opinion. Under the regulations, applicable to this case, only "licensed

24

physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); *see Molina*, 674 F.3d at 1111.  Nurse practitioners and physician assistants are "other sources" for claims filed before March 27, 2017.  *Dale v. Colvin*, 823 F.3d 941, 943 (9th Cir. 2016).  "Other sources cannot establish the existence of a medically determinable impairment" but can provide "special knowledge of the individual and…insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P, 2006 WL 2329939, at *2 (2006).  Opinions from "other sources" may be discounted provided the ALJ identifies reasons germane to each source for doing so.  *See Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017).

Plaintiff argues NP Desai should be treated as an accepted medical source opinion.  (Doc. 18 at 20, n. 5).  Plaintiff cites to *Benton v. Barnhart*, and *Gomez v. Chater*, for the proposition that, as a member of a treatment team under the supervision of Dr. Dawn Risely, she should be afforded deference under the treating physician rule.  *Id*. (citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), *Benton v. Barnhart*, 331 F.3d 1030 (9th Cir. 2003)).

The Court finds *Gomez* is distinguishable from this case.  In *Gomez*, the Ninth Circuit held that "other" sources constitute an acceptable medical source where they work in conjunction with a physician as part of an interdisciplinary team.  74 F.3d at 971.[6]  To trigger this exception there must be evidence of close supervision that the "other source" on the team in essence becomes the agent of the acceptable medical source.  *E.g., Ramierz v. Astrue*, 803 F. Supp. 2d 1075, 1081 (C.D. Cal. 2011).

On January 27, 2017, Dr. Risely saw Plaintiff for treatment at Fresno County Mental Health.  AR at 631-32.  Dr. Risely noted Plaintiff had difficulty communicating, completing sentences, was disorganized, and claimed she was hearing voices.  *Id*. at 631.  Dr. Risely found Plaintiff's orientation, intelligence, insight, and judgment were normal, but she was also

---

[6] The subsection of the regulation providing the basis for the *Gomez* holding was deleted by an amendment in 2000, and an "interdisciplinary team" was removed from the definition of "acceptable medical sources."  *Vasquez v. Kijakazi*, No. 1:20-cv-00680-SKO, *2022* WL 827002, at *9 (E.D. Cal. Mar. 18, 2022) (collecting cases).  The Ninth Circuit has not directly addressed whether *Gomez* remains good law.  *Id*.  The Court finds it unnecessary to address the question of *Gomez*'s applicability because the case is distinguishable from this matter.

suspicious, alert, depressed, anxious, and blunted.  *Id*.  Dr. Risely was unable to diagnose Plaintiff and expressed concern about "methamphetamine intoxication." *Id*. at 632.  Dr. Risely prescribed Plaintiff Zyprexa.  *Id*.

Plaintiff saw Dr. Risely for a second time on March 27, 2017.  *Id*. at 685-86.  Dr. Risely noted Plaintiff had been provided Prozac by her primary care physician.  *Id*. at 685.  Dr. Risely reported Plaintiff felt better on the Prozac, but she was not compliant with her administration of medications on a regular basis.  *Id*.  Dr. Risely found Plaintiff was disorganized and "her voices are exacerbating" after taking Prozac.  *Id*.  Dr. Risely noted Plaintiff was cooperative, alert, with normal speech, orientation, insight, judgment, but also malodorous, anxious, and blunted.  *Id*.  Dr. Risely expressed concerns that Plaintiff was using illicit substances.  *Id*. at 686.  Dr. Risely continued Plaintiff's prescription for Zyprexa and advised against continuing the Prozac provided by her primary care physician.  *Id*.

Apart from these two sessions with Dr, Risely, Plaintiff primarily was treated by NP Desai at Fresno County Mental Health.  NP Desai's treatment notes and opinions do not demonstrate that Dr. Risely closely supervised NP Desai, consulted with NP Desai, or otherwise had an agency relationship with NP Desai.  *Id*. at 672-75, 679-82, 885-86, 890-95, 904-08, 952-57.  Moreover, the mental impairment questionaries submitted by NP Desai setting forth her opinion regarding Plaintiff's limitations were not signed by Dr. Risely.  *Id*. at 672-75, 679-82, 885-86, 890-95, 904-08; *see Mack v. Astrue*, 918 F. Supp. 2d 975, 983 (N.D. Cal. 2013) (finding that a social worker was not an acceptable medical source where the mental impairment questionnaire at issue was prepared and signed by only the social worker); *cf. Swanson v. Comm'r of Soc. Sec. Admin.*, 274 F. Supp. 3d 932, 936-37 (D. Ariz. 2017) (finding nurse practitioner to be an acceptable medical source where the supervising physician co-signed the medical source statement prepared by the nurse practitioner).  Accordingly, *Gomez* does not support Plaintiff's position.

Similarly, *Benton* does not apply to this case.  In *Benton*, the Court held in determining whether a physician or other acceptable medical source should be considered a treating physician with the associated presumption of controlling weight, "[i]t is not necessary, or even practical, to

1  draw a bright line distinguishing a treating physician from a non-treating physician."  331 F.3d at

2  1038 (quoting *Ratto v. Sec'y of Health and Human Servs.*, 839 F. Supp. 1415, 1425 (D. Or.

3  1993)).  "Rather, the relationship is better viewed as a series of points on a continuum reflecting

4  the duration of the treatment relationship and the frequency and nature of the contact."  *Id*.  Thus,

5  under *Benton*, to even be considered a treating physician, the source has to be a physician or other

6  *acceptable* medical source.  (emphasis added).  A nurse practitioner does not fall within the ambit

7  of "acceptable medical sources."  *Cf. Braggs v. Comm'r of Soc. Sec.*, No. 1:19-cv-1135-HBK

8  (SS), 2021 WL 4129657, at *3 (E.D. Cal. Sep. 10, 2021) (finding *Benton* inapplicable to a

9  chiropractor).  Accordingly, the Court concludes that the ALJ needed to give only a germane

10  reason for rejecting NP Desai's opinion, given she is not an "accepted medical source."

11      As discussed above, the ALJ assigned "little weight" to the opinion of NP Desai because

12  the opinion was "inconsistent with the totality of the evidence received at the hearing level."  AR

13  at 47.  Then, the ALJ repeated word for word the same reasoning and cited the same exhibits he

14  provided in evaluating five other opinions.  *Id*. at 45-49.  While the Court has already addressed

15  that this reasoning was neither specific nor legitimate in discounting Dr. Yadegar's opinion, *supra*

16  19-20, the Court finds that the ALJ's reasoning is adequate to reject NP Desai's opinion.

17      A conflict with treatment notes or inconsistency with the medical record as a whole are

18  germane reasons to reject an "other source" opinion.  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th

19  Cir. 2014).  Here, the ALJ presented evidence that Plaintiff was oriented (AR at 559, 666, 952),

20  had organized thought processes (*id*. at 952, 954, 956), normal cognition (*id*. at 954, 956), normal

21  insight and judgment (*id*. 677, 679, 952, 954, 956), intact memory (*id*. 560, 666, 986), that she

22  was cooperative (*id*. at 559, 666, 667, 679), made good eye contact (*id*. at 679, 952, 956), and was

23  friendly (*id*. at 954).  The Court finds this evidence was a germane reason supported by

24  substantial evidence to discount NP Desai's opinion.

25      Plaintiff argues when rejecting NP Desai's multiple mental RFC findings, the ALJ failed

26  to discuss "additional significant objective [mental state examination] findings" in treatment

27  records from Fresno Behavioral Health, records from Plaintiff's involuntary psychiatric holds, or

28  how the findings from Dr. Portnoff comport with NP Desai's findings.  (Doc. 18 at 25-27).

However, since the ALJ has provided a germane reason for discounting NP Desai's opinion, the ALJ did not err in failing to address Plaintiff's alternative evidence.  Therefore, the Court finds that the ALJ properly evaluated NP Desai's opinion.

*       *       *       *       *

Given the limitations and diagnoses of Drs. Yadegar and Ochoa that were to be given "controlling" weight by the ALJ, the Court cannot find the above errors harmless and, instead, concludes that a different disability determination could have been reached had the opinions been afforded the appropriate weight.  *See Tommasetti*, 533 F.3d at 1038 (error may be harmless only if "inconsequential" to disability determination).

**B.      Whether the ALJ Erred by Failing to Provide "Clear and Convincing Reasons for Rejecting Plaintiff's Symptomology Evidence.**

Because the Court finds reversal is warranted, the undersigned declines to adjudicate Plaintiff's separate claim of error regarding the ALJ's evaluation of Plaintiff's subjective complaints.  *See Marcia v. Sullivan*, 900 F.2d 172, 177 n.6 (9th Cir. 1990) ("Because we reverse, we do not reach the other arguments raised."); *see also Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) (same); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand."); *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) (per curiam) ("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other claims.").

**V.      REMEDY**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Plaintiff requests the Court remand this case for payment of benefits based on the credit-as-true rule.  (Doc. 18 at 37).  Generally, an award of benefits is directed when:

/ / /

28

(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d at 1292.  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1998).  Even if all the conditions for an award of benefits are met, the Court nevertheless retains "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021; *see Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015).

Defendant argues "there are outstanding issues that would need to be addressed and there is serious doubt as to Plaintiff's disability, precluding an award of benefits." (Doc. 19 at 15). Defendant contends there are significant inconsistencies in the medical record that require further administrative proceedings. *Id.*

The Court finds that based on the ALJ's opinion and the Court's review of the record, serious doubts exist as to whether Plaintiff is in fact disabled due to her mental and physical impairments.  The Court orders this action remanded for further administrative proceedings consistent with this opinion, and to further develop the record as deemed necessary.

## VI.   CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ erred in failing to provide specific and legitimate reasons supported by substantial evidence in the record to discount Drs. Yadegar and Ochoa's opinions.  Accordingly, IT IS HEREBY ORDERED:

1.  Plaintiff's motion for summary judgment (Doc. 18) is GRANTED;

2.  That the decision of the Commissioner is reversed, and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order; and

3.  The Clerk of Court is DIRECTED to enter judgment in favor of Plaintiff Maxine

29

Martinez and against Defendant Martin O'Malley, Commissioner of the Social
Security Administration.

IT IS SO ORDERED.

Dated:   **May 29, 2024**

UNITED STATES MAGISTRATE JUDGE